IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROBERT BAILEY, | Case No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| CITY OF BELLEVUE, NEBRASKA, a political subdivision of the State of Nebraska, | **(JURY TRIAL DEMANDED)** |
| Defendant. | |

Plaintiff Robert Bailey ("Plaintiff" or "Sgt. Bailey"), for his cause of action against Defendant City of Bellevue, Nebraska ("Defendant" or "the City") alleges and states:

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and 42 U.S.C. §§ 12117(a) and 2000e-5(f)(3), and venue is proper in the United States District Court for the District of Nebraska under 28 U.S.C. § 1391(b). This Court has original jurisdiction over Plaintiff's claims arising under federal law and supplemental jurisdiction over Plaintiff's claims arising under state law.

2. Plaintiff brings this action seeking redress for the violation of Plaintiff's rights under the Nebraska Fair Employment Practices Act ("NFEPA"), Neb. Rev. Stat. § 48-1101 *et seq.*, and the Americans with Disabilities Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADAAA").

3. On September 15, 2017, Plaintiff timely filed a charge of discrimination and retaliation/interference against Defendants with the Nebraska Equal Opportunity Commission ("NEOC") and the U.S. Equal Employment Opportunity Commission ("EEOC").

   a. On August 15, 2018, the NEOC issued its administrative dismissal of

1

Plaintiff's charge and notified him that he had ninety (90) days to file suit after receipt of the notice of administrative dismissal.

        b.     On September 19, 2018, the EEOC issued Plaintiff a Notice of his right to sue Defendant.

        c.     Plaintiff has satisfied and exhausted all private, administrative and judicial prerequisites for the institution of this action.

## II. PARTIES

4.     Plaintiff Robert Bailey ("Plaintiff" or "Sgt. Bailey") has been employed as a sworn law enforcement officer by Defendant City of Bellevue, Nebraska, since on or about March 7, 1996. He is a Sergeant within Defendant's police department, and is Defendant's "employee" within the meaning of NFEPA and the ADAAA.

        a.     At all times relevant herein, Sgt. Bailey suffered from impairments that substantially limit major life activities including, but not limited to, sleeping, concentrating, and working regular shifts in excess of eight (8) hours.

        b.     At all times relevant herein, Sgt. Bailey has had a "disability," "record of disability," and has been "regarded as" having a disabling impairment by Defendant, within the meaning of NFEPA and the ADAAA.

        c.     At all times relevant herein, Sgt. Bailey was a "qualified individual" under NFEPA and the ADAAA.

5.     Defendant City of Bellevue ("Defendant" or "the City") is a political subdivision located in Sarpy County, Nebraska. At all relevant times herein, Defendant has employed more than fifteen (15) employees, is an "employer," and is a "covered entity" within the meaning of the ADAAA and NFEPA.

## III. STATEMENT OF CLAIMS AND ALLEGATIONS

6. Sgt. Bailey suffers from major depression, panic disorder, anxiety, and chronic insomnia.

7. At all times relevant herein, Sgt. Bailey worked within the Criminal Investigations Bureau ("CIB") of Defendant's police department, where he worked a standard eight (8) hour day shift. Defendant City of Bellevue, including those in Sgt. Bailey's supervisory chain of command—Lt. Timothy Melvin, Captain Robert Wood, and Chief Mark Elbert—had notice of Sgt. Bailey's disabilities.

8. In or around the Spring of 2015, Chief Mark Elbert told Sgt. Bailey he was contemplating moving Sgt. Bailey to a Road Patrol position, which would entail Sgt. Bailey working a twelve (12) hour shift. Sgt. Bailey consulted his physician about the proposed move, and Sgt. Bailey's physician restricted Sgt. Bailey from working regular twelve (12) hour shifts due to his disabilities. Sgt. Bailey's physician also encouraged him to request an accommodation from Defendant to address this restriction, and Sgt. Bailey obtained formal accommodation paperwork from Defendant's Human Resources Department to do so.

9. Sgt. Bailey's physician completed the formal accommodation paperwork. While Sgt. Bailey was on his way to submit the paperwork to Defendant's Human Resources Department, Sgt. Bailey met with Chief Mark Elbert as a matter of courtesy and notified him that he would be requesting the accommodation. Chief Elbert read the paperwork, became upset, and threw the paperwork across his desk. Chief Elbert stated that Human Resources "girls" were all stupid and that Sgt. Bailey would be "tying his hands" with the accommodation request. Chief Elbert further told Sgt. Bailey that if Sgt. Bailey did not turn in the formal accommodation request, Chief Elbert would do everything in his power to keep Sgt. Bailey in his current eight

(8) hour position. Due to this assurance, Sgt. Bailey did not submit the formal accommodation paperwork to Defendant's Human Resources Department.

10. Despite Chief Elbert's assurance to Sgt. Bailey, Chief Elbert thereafter sent an email to Captain Robert Wood inquiring whether Captain Wood would agree to move Sgt. Bailey to the Road Patrol. Captain Wood told Chief Elbert he was not interested in moving Sgt. Bailey to the Road Patrol. Captain Wood showed Sgt. Bailey these email communications, which caused Sgt. Bailey a great deal of concern, stress, anxiety, and mental anguish.

11. On or about January 31, 2016, Sgt. Bailey suffered a heart attack and underwent quintuple bypass surgery. After suffering his heart attack, Sgt. Bailey notified Chief Elbert that he was contemplating medical retirement under applicable Nebraska statutes, and Chief Elbert was supportive of that course of action.

12. After recovering from bypass surgery, however, Sgt. Bailey successfully passed a cardiac fitness for duty examination and was cleared by his cardiologist to return to full duty work.

13. Therefore, in or about April 2016, Sgt. Bailey notified Chief Elbert that he would return to full duty work instead of taking a medical retirement. In response, Chief Elbert told Sgt. Bailey he would soon move Sgt. Bailey to a twelve (12) hour Road Patrol shift. Sgt. Bailey replied that he would seek a formal accommodation from Defendant to remain in an eight (8) hour shift, and Chief Elbert told Sgt. Bailey he would "lose" if he sought that accommodation.

14. During the April 2016 meeting, Chief Elbert also referenced his visitation of Canadian police departments and stated that, unlike those departments, Chief Elbert would not allow a bunch of people to have disability accommodations in his department. Chief Elbert also referenced other current or former Bellevue police officers who apparently had disabilities and

4

stated that he did not want another one of those officers in his department. Chief Elbert made similar statements to at least one other law enforcement officer within the Bellevue Police Department.

15. In or around July 2016, Sgt. Bailey filed formal accommodation paperwork with Defendant's Human Resources Department requesting to remain on an eight (8) hour shift, and to avoid interruptions to his sleep off duty. Sgt. Bailey's physician opined that such accommodations would help reduce Sgt. Bailey's risk of having another heart attack, and would help minimize his depression and anxiety symptoms.

16. On or about October 14, 2016, Sgt. Bailey and his attorney, Kelly Brandon, met with Defendant's Human Resources Manager, Ashley Clark, and Defendant's attorney, Angela Forss Schmit, to discuss possible accommodations for Sgt. Bailey including: Sgt. Bailey remaining in an eight (8) hour day shift position; Sgt. Bailey obtaining at least 7 to 9 hours of sleep that are not interrupted by off-duty phone calls; and a flexible start time to accommodate sleep interruptions. During that meeting, Sgt. Bailey disclosed Chief Elbert's comments about not wanting to accommodate employees in his department, and Angela Forss Schmit acknowledged she had heard Chief Elbert say similar things before.

17. On or about November 4, 2016, Defendant sent Sgt. Bailey a response addressing his request to be free from off duty phone calls, but offered no assurance that Sgt. Bailey would remain in an eight (8) hour position. In fact, as an alternative, Defendant proposed moving Sgt. Bailey to a twelve (12) hour shift.

18. On or about November 18, 2016, Sgt. Bailey's attorney, Kelly Brandon, sent a letter to Defendant rejecting the City's proposed accommodations and emphasizing Chief Elbert's discriminatory comments. The letter also included a draft complaint that Sgt. Bailey

would file with the EEOC in the event the City continued to delay and deny approval of Sgt. Bailey's reasonable accommodation requests.

19. On or about November 19, 2016, Sgt. Bailey spoke with Chief Elbert on the phone. At that time, Chief Elbert repeatedly claimed he had never told Sgt. Bailey that he would move Sgt. Bailey to the Road Patrol. This claim was false, as Chief Elbert had made this statement several times before.

20. In or about the early morning hours of Sunday, November 20, 2016, Chief Elbert sent Sgt. Bailey a text message requesting to meet with Sgt. Bailey and Sgt. Bailey's spouse off duty at the Bellevue Police Department later that morning.

21. Sgt. Bailey and his spouse met with Chief Elbert at the Police Department on the morning of November 20, 2016, as requested, for nearly one hour. Unbeknownst to Chief Elbert, Sgt. Bailey audio recorded the meeting due to Chief Elbert's untruthful denial of making particular statements in the past.

   a. During the meeting, Chief Elbert continued to deny that he had ever told Sgt. Bailey that he would move him to Road Patrol. Chief Elbert also repeatedly claimed other City officials—Ashley Decker, Karen Jackson, Angela Forss Schmit, and Joe Mangiamelli—were "dug in" against Sgt. Bailey's formal accommodation requests, and Chief Elbert was not. Chief Elbert told Sgt. Bailey that, due to the frustration of those officials and Defendant's expenditure of money due to Sgt. Bailey's formal accommodation requests, the "deck is really stacked against [Sgt. Bailey]" and Sgt. Bailey's formal accommodation requests would not be resolved without a "huge fight" that would rage on for "quite some time."

   b. Chief Elbert then proposed an alternative to Sgt. Bailey's formal accommodation requests. Specifically, Chief Elbert offered to not move Sgt. Bailey from an

6

eight (8) hour CIB shift barring Sgt. Bailey "screwing up [in CIB] so badly that [he's] worn out [his] welcome"; and offered to not require Sgt. Bailey to answer his phone off-duty.

    c.    In exchange for these "unofficial" accommodations, however, Chief Elbert: (i) required Sgt. Bailey to keep the unofficial accommodations secret from everyone, including his supervisors (Lt. Melvin and Capt. Wood), his attorney, his subordinates, and City officials; (ii) required Sgt. Bailey to withdraw his formal accommodation requests from the City; (iii) required Sgt. Bailey to tell his attorney he was dropping the formal accommodation requests because he was unhappy with his attorney's performance, not because Chief Elbert had offered him unofficial accommodations; (iv) and directed Sgt. Bailey to conceal the phone accommodation from his supervisors by placing his phone on vibrate mode while off duty, placing the phone someplace it could not be heard, and then telling his supervisors he simply did not hear his phone if they asked why he did not answer his phone. Chief Elbert reiterated that if Sgt. Bailey proceeded with his formal accommodation requests instead, Defendant would dig in and fight those requests for a long period of time.

    d.    Sgt. Bailey, feeling he had little other choice due to the state of his health, accepted Chief Elbert's "unofficial" accommodations, and withdrew his formal accommodation request from the City on the afternoon of November 20, 2018.

22.    On or about February 8, 2017, Chief Elbert called another private meeting with Sgt. Bailey. Unbeknownst to Chief Elbert, Sgt. Bailey audio recorded the meeting due to Chief Elbert's untruthful denial of making particular statements in the past.

    a.    During the February 8, 2017, meeting Chief Elbert notified Sgt. Bailey that Chief Elbert had been chosen, at the urging of Defendant's Mayor, as the next U.S. Marshal for the District of Nebraska, subject to the typical congressional vetting process. Chief Elbert

7

told Sgt. Bailey he did not want Sgt. Bailey to hear about Chief Elbert leaving for the U.S. Marshals and think he needed to renew his request for official accommodations from the City. Chief Elbert told Sgt. Bailey that Bellevue Police Captain David Stukenholtz would be taking over as Acting Chief; that Chief Elbert had told Capt. Stukenholtz about the "unofficial" accommodations; and that Capt. Stukenholtz had no intention of altering the "unofficial" accommodations. Chief Elbert reiterated that Capt. Stukenholtz was "very aware" of the unofficial accommodations.

    b. During the meeting, Sgt. Bailey requested Chief Elbert to tell Sgt. Bailey's supervisors—Lt. Timothy Melvin and Captain Robert Wood—about the "unofficial" accommodations because Sgt. Bailey felt deceptive by turning his phone down at night and not answering it. Chief Elbert replied, "[Y]ou're not being deceptive. That's the agreement . . . . it's the expectation." Chief Elbert declined to inform Sgt. Bailey's supervisors about the unofficial accommodations and told Sgt. Bailey to just "ride it out" and not seek official accommodations until after Chief Elbert left for the U.S. Marshals.

  23. On February 10, 2017, Sgt. Bailey called a meeting with Chief Elbert to discuss how upcoming negotiations between Defendant and Sgt. Bailey's union may affect the unofficial accommodation. Unbeknownst to Chief Elbert, Sgt. Bailey audio recorded the meeting due to Chief Elbert's untruthful denial of making particular statements in the past. During that meeting, Chief Elbert told Sgt. Bailey that he was trusting that the existence of "unofficial" accommodations remained a secret because Chief Elbert did not want to be "exposed." Chief Elbert further reiterated to Sgt. Bailey that as long as Chief Elbert and Capt. Stukenholtz were leading the department, it would be "status quo." Chief Elbert further stated that Angela Forss Schmit was still of the opinion that Sgt. Bailey did not qualify for disability accommodations,

8

and again stated that there would have been a major fight between Defendant and Sgt. Bailey if Sgt. Bailey had continued to seek official accommodations.

24. On or about April 7, 2017, Lt. Timothy Melvin confronted Sgt. Bailey over why Sgt. Bailey had not answered two off-duty calls on or about April 4 and April 6, 2017. Sgt. Bailey, in accordance with his sworn oath as a police officer, told Lt. Melvin the truth—i.e., Sgt. Bailey told Lt. Melvin that Chief Elbert had directed Sgt. Bailey to tell Lt. Melvin that in such situations he was supposed to tell Lt. Melvin that he did not hear the phone ring. Sgt. Bailey also told Lt. Melvin about the "unofficial" accommodations, and thereafter told Capt. Bob Wood and Capt. Stukenholtz about the "unofficial" accommodations.

25. To Sgt. Bailey's surprise, Capt. Stukenholtz told Sgt. Bailey that Chief Elbert had never told him about the "unofficial" accommodations, and verified that this is the type of thing Captain Stukenholtz would remember. Capt. Stukenholtz has confirmed, in sworn testimony in another matter, that Chief Elbert was being untruthful when he told Sgt. Bailey he had told Capt. Stukenholtz about the "unofficial" accommodations.

26. On or about May 22, 2017, Sgt. Bailey noticed a growing change in Lt. Melvin's demeanor toward him. Sgt. Bailey asked Lt. Melvin about this, and Lt. Melvin told Sgt. Bailey that the "elephant in the room" was the unofficial accommodation Chief Elbert gave Sgt. Bailey for off-duty phone calls. Lt. Melvin stated that the accommodation "sucks" for Lt. Melvin, it "sucks" for the other CIB sergeant, and that it was negatively affecting Sgt. Bailey's subordinates' morale.

27. The following day, on or about May 26, 2017, Lt. Melvin gave Sgt. Bailey written counseling as a pretext for retaliating against Sgt. Bailey due to receiving the "unofficial" accommodations regarding answering phones. Before receiving this written counseling, Sgt.

Bailey had only received a few written counselings, and no other discipline, in roughly twenty-one (21) years of working as a law enforcement officer for Defendant.

28. On or about May 31, 2017, Sgt. Bailey complained to Capt. Wood about Lt. Melvin's written counseling. Capt. Wood told Sgt. Bailey that he did not want to know any more about the "unofficial" accommodations than Sgt. Bailey had already told him because Capt. Wood was afraid that Chief Elbert would be angry with Capt. Wood for knowing about the accommodations. Capt. Wood told Sgt. Bailey he would speak with Lt. Melvin about the written counseling, and encouraged Sgt. Bailey not to tell others about the unofficial accommodations until after Chief Elbert's departure for the U.S. Marshals.

29. In or about June 19, 2017, Lt. Melvin again told Sgt. Bailey that the "unofficial" phone accommodations "sucked" and were "not fair." Lt. Melvin's increased scrutiny and harassment of Sgt. Bailey caused Sgt. Bailey additional stress, anxiety, insomnia and mental anguish.

30. Sometime after February 10, 2017, Sgt. Bailey also spoke with Human Resources Manager Ashley Decker. Decker informed Sgt. Bailey that it was Chief Elbert—not Jackson, Forss Schmit, Mangiamelli, or Decker—who had been "dug in" against Sgt. Bailey's formal accommodation requests all along. Decker further noted that the question of whether a particular accommodation is reasonable or an undue burden would be for the Chief of Police to decide because other City officials have insufficient operational knowledge to make that determination. Finally, Decker confirmed that Sgt. Bailey should wait until Chief Elbert's departure for the U.S. Marshals to renew his formal accommodation requests. Decker confirmed, in sworn testimony in another matter, that Chief Elbert lied when he told Sgt. Bailey that Jackson, Forss Schmit, Mangiamelli and Decker were dug in against Sgt. Bailey's formal accommodation requests.

31. The employees and agents of Defendant referenced herein were all acting within their course and scope of employment at all material times referenced herein.

32. Defendant's deception and manipulation of Sgt. Bailey, and Defendant's interference with Sgt. Bailey's right to obtain formal reasonable accommodations increased the symptoms of Sgt. Bailey's disabilities, resulting in greater anxiety, stress, insomnia, and mental anguish, and damage to Sgt. Bailey's professional reputation, physical injury, medical bills, and unnecessary depletion of his sick leave bank.

33. Due to Defendant's exacerbation of Plaintiff's disability, Plaintiff has been treated in the emergency room three times since January 2017 for anxiety, stress and accompanying chest pain, high blood pressure, and difficulty breathing.

### FIRST CAUSE OF ACTION—VIOLATION OF THE ADAAA: FAILURE TO ACCOMMODATE (42 U.S.C. § 12112(b)(5)(A))

34. Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

35. Defendant has discriminated against Plaintiff, a disabled person, on the basis of his disabilities in violation of 42 U.S.C. §§ 12101 *et seq.*, because:

    a. At all relevant times Plaintiff had one or more "disabilities" under the ADAAA;

    b. Plaintiff's disabilities and consequential limitations were known to Defendant;

    c. At all relevant times Plaintiff was qualified to perform the essential functions of his job as Sergeant with reasonable accommodations, including remaining in an eight (8) hour shift and not being subjected to off-duty phone calls; and

      d.      Defendant failed to reasonably accommodate Plaintiff, and failed to engage in a good faith interactive accommodation process with Plaintiff.

      36.      As a direct and proximate cause of the failure of the Defendant to reasonably accommodate Plaintiff, Plaintiff has suffered significant humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, physical injury, medical bills, and unnecessary depletion of his sick leave bank.

      37.      The actions of the Defendant were unlawful, willful and/or with malice and/or with reckless disregard for Plaintiff's rights.

      38.      Defendant knew the failure to reasonably accommodate Plaintiff may be a violation of state and federal law.

## SECOND CAUSE OF ACTION—VIOLATION OF THE ADAAA:
## RETALIATION (42 U.S.C. § 12203(a))

      39.      Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

      40.      Plaintiff requested "official" reasonable accommodations from Defendant, Plaintiff opposed Defendant's denial of "official" reasonable accommodations, and Plaintiff threatened to file a charge of discrimination with the EEOC.

      41.      Plaintiff's foregoing activities are "protected activities" under the ADAAA.

      42.      Plaintiff had a good faith belief that his requested accommodations were appropriate.

      43.      Defendant manipulated and deceived Plaintiff, denied Plaintiff's reasonable accommodation requests, and refused to participate in a good-faith interactive accommodation process due to Plaintiff's foregoing protected activities, in violation of the ADA's anti-retaliation

provisions.

44. Defendant's retaliatory treatment of Plaintiff might persuade a reasonable person in the same or similar circumstances not to engage in the foregoing protected activities.

45. As a direct and proximate cause of Defendant's retaliation against Plaintiff, Plaintiff has suffered significant humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, physical injury, medical bills, and unnecessary depletion of his sick leave bank.

46. Said retaliatory treatment of Plaintiff was unlawful, willful and/or with malice and/or done with reckless disregard for Plaintiff's rights.

47. Defendant knew their retaliatory treatment of Plaintiff may be a violation of state and federal law.

### THIRD CAUSE OF ACTION—VIOLATION OF THE ADAAA:
### INTERFERENCE (42 U.S.C. § 12203(b))

48. Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

49. Defendant coerced and intimidated Plaintiff, and interfered with Plaintiff's exercise or enjoyment of his rights guaranteed under the ADAAA. Defendant also took these actions on account of Plaintiff's exercise of his rights under the ADAAA.

50. Defendants coercion, intimidation and interference might persuade a reasonable person in the same or similar circumstances to not exercise their rights guaranteed under the ADAAA.

51. As a direct and proximate cause of the Defendants' coercion and intimidation of Plaintiff, and interference with Plaintiff's right to exercise rights guaranteed under the ADAAA,

Plaintiff has suffered significant humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, physical injury, medical bills, and unnecessary depletion of his sick leave bank.

52. Said coercion, intimidation, and interference was unlawful, willful and/or with malice and/or done with reckless disregard for Plaintiff's rights.

53. Defendant knew its coercion and intimidation of Plaintiff, and interference with Plaintiff's right to exercise rights guaranteed under the ADAAA, may be a violation of federal and state law.

**FOURTH CAUSE OF ACTION—VIOLATION OF NFEPA:**

**FAILURE TO ACCOMMODATE (Neb. Rev. Stat. §§ 48-1104 & 48-1107.02(1)(e))**

54. Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

55. Defendant has discriminated against Plaintiff, a disabled person, on the basis of his disabilities in violation of Neb. Rev. Stat. §§ 48-1104 and 48-1107.02(1)(e):

    a. At all relevant times Plaintiff had one or more "disabilities" under NFEPA;

    b. Plaintiff's disability and its consequential limitations were known to Defendant;

    c. At all relevant times Plaintiff was qualified to perform the essential functions of his job as Sergeant with reasonable accommodations, including remaining in his eight (8) hour shift and not being subjected to off duty phone calls; and

    d. Defendant failed to reasonably accommodate Plaintiff, and failed to engage in a good faith interactive accommodation process with Plaintiff.

56. As a direct and proximate cause of the failure of the Defendant to reasonably accommodate him, Plaintiff has suffered significant humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, physical injury, medical bills, and unnecessary depletion of his sick leave bank.

57. The actions of the Defendant were unlawful, willful and/or with malice and/or with reckless disregard for Plaintiff's rights.

58. Defendant knew the failure to reasonably accommodate Plaintiff may be a violation of state and federal law.

## FIFTH CAUSE OF ACTION—VIOLATION OF NFEPA: RETALIATION (Neb. Rev. Stat. § 48-1114)

59. Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

60. Plaintiff requested "official" reasonable accommodations from Defendant, Plaintiff opposed Defendant's denial of "official" reasonable accommodations, and Plaintiff threatened to file a charge of discrimination with the EEOC.

61. Plaintiff's foregoing activities are "protected activities" under NFEPA.

62. Plaintiff had a good faith belief that his requested accommodations were appropriate.

63. Defendant manipulated Plaintiff, deceived Plaintiff, denied Plaintiff's reasonable accommodation requests, and refused to participate in a good-faith interactive accommodation process due to Plaintiff's foregoing protected activities, in violation of NFEPA's anti-retaliation provisions.

64. Defendant's retaliatory treatment of Plaintiff might persuade a reasonable person

in the same or similar circumstances not to engage in the foregoing protected activities.

65. As a direct and proximate cause of Defendant's retaliation against Plaintiff, Plaintiff has suffered significant humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, physical injury, medical bills, and unnecessary depletion of his sick leave bank.

66. Said retaliatory treatment of Plaintiff was unlawful, willful and/or with malice and/or done with reckless disregard for Plaintiff's rights.

67. Defendant knew their retaliatory treatment of Plaintiff may be a violation of state and federal law.

## SIXTH CAUSE OF ACTION—VIOLATION OF NFEPA:
## INTERFERENCE/HARASSMENT (Neb. Rev. Stat. §§ 48-1104 & 48-1114)

68. Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

69. Defendant coerced, harassed, and intimidated Plaintiff, and interfered with Plaintiff's exercise or enjoyment of his rights guaranteed under the NFEPA. Defendants also took those actions on account of Plaintiff exercising his rights under the NFEPA.

70. Defendants coercion, intimidation, harassment, and interference might persuade a reasonable person in the same or similar circumstances to not exercise their rights guaranteed under the NFEPA.

71. As a direct and proximate cause of the Defendants' coercion, harassment, and intimidation of Plaintiff, and interference with Plaintiff's right to exercise rights guaranteed under the NFEPA, Plaintiff has suffered significant humiliation, inconvenience, stress, anxiety, sleeplessness, emotional pain and suffering, loss of reputation, physical injury, medical bills, and

16

unnecessary depletion of his sick leave bank.

72. Said coercion, harassment, intimidation, and interference was unlawful, willful and/or with malice and/or done with reckless disregard for Plaintiff's rights.

73. Defendant knew its coercion, harassment, and intimidation of Plaintiff, and interference with Plaintiff's right to exercise rights guaranteed under the NFEPA, may be a violation of federal and state law.

## SEVENTH CAUSE OF ACTION—VIOLATION OF ADAAA
## HOSTILE WORK ENVIRONMENT (42 U.S.C. § 12112(a))

74. Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

75. In spite of Plaintiff's known heart attack, risk of future heart attacks and continued struggle with chronic insomnia, anxiety, major depression, and panic disorder, Defendant took actions to intimidate, harass, manipulate, and deceive Plaintiff on account of Plaintiff's known disabilities, record of disability, and Defendant regarding Plaintiff as being disabled.

76. The foregoing actions of Defendant were unwelcomed and affected the terms, conditions or privileges of Plaintiff's employment, in violation of the ADAAA's anti-discrimination provisions.

77. As a direct and proximate cause of the Defendant's creation of a hostile work environment, Plaintiff suffered significant humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, physical injury, medical bills, unnecessary depletion of his sick leave bank, and exacerbation of the symptoms of his disabilities.

78. Defendant's creation of a hostile work environment was unlawful, willful and/or

17

with malice and/or done with reckless disregard for Plaintiff's rights.

79. Defendant knew its creation of a hostile work environment may be a violation of federal and state law.

## EIGHTH CAUSE OF ACTION—VIOLATION OF NFEPA
## HOSTILE WORK ENVIRONMENT (Neb. Rev. Stat. §§ 48-1104 & 48-1107.02)

80. Plaintiff incorporates and fully sets forth all allegations contained elsewhere in this Complaint in this section.

81. In spite of Plaintiff's known heart attack and continued struggle with chronic insomnia, anxiety, major depression, and panic disorder, Defendant took actions to intimidate, harass, manipulate, and deceive Plaintiff on account of Plaintiff's known disabilities, record of disability, and Defendant regarding Plaintiff as being disabled.

82. The foregoing actions of Defendant were unwelcomed and affected the terms, conditions or privileges of Plaintiff's employment, in violation of NFEPA's anti-discrimination provisions.

83. As a direct and proximate cause of the Defendant's creation of a hostile work environment, Plaintiff suffered significant humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, physical injury, medical bills, unnecessary depletion of his sick leave bank, and exacerbation of the symptoms of his disabilities.

84. Defendant's creation of a hostile work environment was unlawful, willful and/or with malice and/or done with reckless disregard for Plaintiff's rights.

85. Defendant knew its creation of a hostile work environment may be a violation of federal and state law.

WHEREFORE, Plaintiff prays for:

a.  An award of costs in this suit and reasonable attorney's fees;

b.  An Order enjoining Defendant from engaging in unlawful discrimination, harassment, interference and retaliation practices;

c.  An Order granting Plaintiff damages for attorney's fees, medical bills, humiliation, inconvenience, stress, anxiety, insomnia, emotional pain and suffering, loss of reputation, and physical injury incurred by Plaintiff as a result of the unlawful actions of Defendant, and granting Plaintiff restoration of his depleted sick leave bank;

d.  An award of prejudgment interest;

e.  Such other future relief as the Court deems just and proper under the circumstances.

DATED this 21st day of September, 2018.

ROBERT BAILEY, Plaintiff

By: /s/ *Thomas P. McCarty*
Thomas P. McCarty, #24171
KEATING, O'GARA, NEDVED
 & PETER, P.C., L.L.O.
530 South 13th Street, Suite 100
Lincoln, NE 68508
(402) 475-8230
tmccarty@keatinglaw.com

## JURY DEMAND AND DESIGNATION OF TRIAL

Plaintiff hereby demands a trial by jury on all issues. Plaintiff hereby designates Lincoln, Lancaster County, Nebraska, as the place of trial

By:/s/*Thomas P. McCarty*
Thomas P. McCarty, #24171